All right, everybody be seated and counsel who are going to argue, please approach and tell us who you are and who you represent. Good morning, Justices. My name is James Montgomery, Jr. I represent the plaintiff, Carolyn Anderson. I see seniors in the house as well. Thank you for recognizing us. Good man. Your Honors, good morning. My name is Irene Dmitrieva. I represent the Chicago Transit Authority. Okay, typically go 15 minutes aside, leave a little time for rebuttal. If we harass you unduly with questions, we might give you a little bit more time. The microphone there is both for recording and amplification, so keep your voice up. And we have got a lot of people out here listening today, so thank you very much. Thank you. Mr. Montgomery, proceed. And I understand from the previous panel, I should just launch right into it, so I should. Yeah. We have a large group of externs and clerks out here, so maybe a little description of factually what happened might be a good way to start. Certainly, particularly in this case. Right. Carolyn Anderson is the administrator of the estate of Jerome Anderson, who died in the course of this case. The circuit court reviewed on a motion to dismiss the complaint of Carolyn Anderson and dismissed that complaint based on the issue of duty. So what happened here was almost, actually a little bit over two years ago, Jerome Anderson had paid his fare for the CTA L platform located at Kedzie and Holman, walked down to the platform. When he's observed by a surveillance camera walking down, it seems to be walking just fine at that point in time, right? We have the modern-day benefit of having a lot of video of his actions in this case. Exactly right, Your Honor. So he walks down. We see him walk down. He appears to be, as he walks down, in okay shape. There's nothing that's unusual about his descent to the platform. Once he gets down to the platform, he appears on the videotape, and we've pled all of this as well, ready to board a train. In your briefs, you indicated that he was going to board a train to the loop, right? Yes. But the train that he walked toward wasn't going to the loop, was it? Exactly, and that's part of the CTA employees would not know that, but that lets us know that he was experiencing some degree of disorientation already. And that degree of disorientation increased and increased by way of overt, outward movements by Mr. Anderson in the way he walked. Well, how would the CTA employees know that? Know that his behavior? Changed over time. Yeah, well, let me start with from the video, which is the vantage point of all of us right now is a singular vantage point, and so we don't know all of which employees saw him, when they saw him. We saw a video. We know the trains are coming in and going out. Yes. The conductors are looking for people on the platform. Yes. We know there's a custodian in the picture and goes out of the picture, and so all these people are in and out in a matter of seconds. Yes, everyone except for Mr. Anderson, so that's one thing. Well, that's not the one thing, though. That's one thing. Because you're saying the CTA is responsible. So if everybody gets a few-second look, how do they know? Well, it's not everyone getting a three-second look. It depends on who the employee is. For example, there's an employee that does come into the video, who is someone who is a cleaner cleaning, I believe, the CTA. And there's no indication that there's interaction between that maintenance worker and? That's right. There was absolutely no interaction. That's something that would have to be discovered in discovery, whether or not that person actually saw and made a judgment as to the status. Well, why would that matter? What responsibility does this custodian have? The responsibility is that person is an employee of the CTA just like every other employee. They have to make well-being checks? Yes. But if we make a distinction between one employee and another in terms of their being able to use their just general powers of observations, then we're putting a greater burden on the CTA than would otherwise be there. The fact of the matter is Mr. Anderson was behaving in a way that anyone using any general observation powers could have seen it was on. A clear example of that was when he walked up to, and I'm sure that your honors remember this, he walked up to an open car door, CTA train door. He started towing that door, and while he was towing that door, and we don't know why, but it appeared as though he was trying to make sure his foot was on terra firma. While he was towing the door, the door abruptly closed, he stepped back, abruptly and startled, and then he proceeded to again aimlessly walk for the next 20 to 30 minutes. In terms of legal duty, had he been injured during that particular ambulation that you're talking about where he's trying to get on, maybe going to get on, and maybe he got hit by the door and fell down and suffered some sort of an injury, you'd have a much different legal duty analysis, wouldn't you? Oh, I don't think so. I think Pence versus Northeast Illinois Railway, that's METRA. Academy versus CTA. Delray versus METRA again. Make it very clear that anyone standing on the platform who is at risk of harm, the CTA has a legal duty to them as a common carrier. And this court, not this court, I'm sorry, the circuit court reviewed those facts and reviewed that evidence and that law, and the circuit court found, in fact, that there was a legal duty based on the special relationship under common carrier and based on the business invitee. The trial court had two analyses. The first one, the trial court agreed with your alternative pleading that he was, in fact, a passenger, even though there's some conflicting case law on that. Yeah. Well, there is some historical conflicting case law, but most of the recent case law and the case law he cited in his opinion supports very clearly and I would maintain very strongly the fact that Mr. Anderson standing on the platform within the depot and with the intent to board a train was indeed a passenger. But you would concede, would you not, that there are a number of cases in Illinois going back to the early 1900s where to be called a passenger one must be in the act of boarding, be upon, or be in the act of alighting from the bus or train? There were cases that are older cases that do say that, but the seminal cases and the more recent cases on the subject are the three I mentioned, Pence, Kadame, and Del Ray, Del Rayal, rather. In all three of those cases. Kadame, the person was walking to get on and, you know, in the act of boarding when her heel got stuck in the platform. Well, I do understand that. It's a little bit different than what you got here. It's a little bit different, but. Well, there's no train involved here. Right. Right. And there's no train involved in the fall itself. There certainly was the intent to board. Yeah, and all of the cases that you cite from the restatement and the comments where they have the different examples. Yes. Each and every one of those, the person was on a train. Yeah, well, the restatement wasn't dealing with that issue at the time, so that wasn't the issue of the illustrations that I raised were covering it. They were really more geared toward looking at the two duties, the duty to protect and the duty to render aid, and that's where I think this court, the circuit court, went awry in this case. The circuit court found under the restatement, 314A1 and 2, that there was indeed a duty, and then the court proceeded to look at duty breaches that were claimed in the complaint as though they were separate from duty and then infused the concept of medical assessment into every one of the duty breaches that was alleged in the complaint. We did not plead that there was a necessity or that there was a breach because there was the absence of a medical assessment with respect to Mr. Anderson. Our pleading was there simply needed to be an employee, a citizen judgment that this person. I don't think the word citizen judgment is in your complaint. Oh, no, no. We're not amending here, are we? No. Okay. But, I mean, someone other than a medical professional, a judgment made by that person who would be an employee of the CTA that Mr. Anderson clearly needed some kind of aid and assistance. That's all we pled. We didn't infuse the medical part. And once the medical part was infused by the court, the court used that with respect to each one of the duty factors to render its judgment that none of them are duties that are upheld in Illinois because the burden on the CTA would be far too great. You didn't supply the court below or the court here with an Illinois precedent that would impose the kind of duty that you're talking about, did you? No, I certainly did not. And what's more. So this would be, if you were to prevail, it would be a question of first impression. No. Well, let me step back on that. In terms of rendering aid and trying to figure out what's going on with this person. I don't think so. It may be with respect to the CTA with a medical, where a guy did have a medical issue and was disoriented. But very clearly, and we're talking about factually, but very clearly this duty to render aid has been part of the law since 1965 or 1966 when Marshall v. Burger King was decided and adopted the restatement second. Marshall was relatively recent. Go ahead. I'm sorry. You're right. 2006. Yeah. Even if employers are watching that platform 24-7 and paying attention to it, this isn't a case where he collapsed on the platform and because of that collapse fell onto the rails. I mean, there's no indicator before this tragic accident that there was something really wrong. He could have been waiting for somebody. He could have been trying to make up his mind about whether he really wanted to go down the loop. I mean, there's nothing in his behavior on that platform that would have really telescoped to anybody watching it, uh-oh, there's going to be a problem here, until the actual event. There's nothing you can really hang your hat on. He's not bobbing and weaving. He's not approaching people in an aggressive manner. He's not stumbling and falling. He hasn't passed out. There's nothing here that would say to anybody watching, assuming for a minute that that was even their responsibility, but if they were watching, there wouldn't have been anything that said, we better get down there, there is some sort of emergency down there. He wasn't accosting people. He wasn't being accosted. He wasn't passed out on the platform. Nothing like that. He's just standing there on the platform. Justice Buchinsky, I respectfully disagree with you on that point. I think the video, and it may be a matter of interpretation, but I think the video, and that's an issue I would say ultimately is for a jury, but the video I think is clear. He is, he's not wildly swinging back and forth, but he is stumbling and catching himself. He is walking what I call the inch walk. He can barely walk. He is so disoriented. When he steps in. Well, wait, you're saying he's so disoriented. Any casual observer watching that might have just not known what was causing that, might have just assumed that's how he walked. Well, well. Might have just assumed that was his normal gait. Well, it is possible if that were the only thing, but all of these items taken together would demonstrate to even a casual observer that something's wrong with this man. Even the CTA is indicated in this brief. The pillar had to hold him up at times, and it was obvious that was happening. It was so obvious. There were dozens if not hundreds of people that walked past him in that video. Not one of them stopped. I'm glad you mentioned that, and I'm sorry that happened, but the reality is those dozens of people were not CTA employees and didn't have an affirmative duty under the restatement. No, but it was so obvious you would think. In a city like Chicago, people do try to help other people. Somebody would have said, you know, this man's ill. He didn't reach out to anybody, right? He didn't say anything to anybody, and people just passed him. And people. Throughout the 20 or 30 minutes of the video. And people left him alone in the area of his platform. But most of the patrons that were there were on the train and off the train so quickly they wouldn't have had the opportunity to do that, as opposed to employees who were there. No, wait, wait. The employees who were there, there's only one employee I know who was there, was a custodian. Otherwise, they were there for a few seconds coming and going with trains. They had other things to look at. What we could see within the camera view was the custodian. Well, that's the only thing we know about. And engineers. We couldn't see the engineers, but we know they were on each of the ten trains that passed by. We know the engineers were on the train that he towed the threshold of the door. In what I characterize as an odd manner, that I think alone would place an employee for the CTA, and particularly the train engineer, on notice that there is a problem here with this man. All right. So let's move a little bit forward to what specifically happened here. The trial court talked at some length in its memorandum order about foreseeability and whether or not it would be reasonably foreseeable that a person could have some kind of a medical event. In this case, you said it was diabetic issues. Was he a known diabetic or something? He was, but that's really not the issue. I'll get you there. Okay. But was he a known diabetic? Yes. Okay. But in terms of what happened, in the moment or two before he got himself to the edge of the platform and then wound up sort of springing off it in a very unexpected and unusual manner, he was doing something with a can or a bottle, wasn't he? Yes. Yes. Okay. Why is it that that never made it into anybody's briefs? Well, I'm not sure, but again, it was odd behavior. I think probably it didn't make it into either of our briefs because it was kind of relative to some of the other movements that he exhibited. But this was right before he fell, he dropped a can or a bottle, some kind of container that he was drinking from, and then using, if this is his foot, he kicks the can, if you will, closer to the boarding area, the stripe there, and then goes over and pushes it a little further, and now the can's right on the edge. And he steps on that can, and that's what provokes the fall. The eventual loss of balance. How the heck is the CTA supposed to expect that that could happen? Well, the CTA isn't supposed to expect that. Are they supposed to guard against it happening? The CTA isn't necessarily supposed to guard against, obviously, him kicking a can or his finding his way over to the edge of the platform. That is just how he – that wasn't the first time he found his way over to the platform. He found his way over to the platform at least one other time. The other time he caught himself and was able to migrate back to the middle. There was a train there, right? No, no, no. That was the third time. Okay, I know what you're talking about. That was the third time. And that was part of this entire scenario, that this man was behaving in such an over-the-period-of-time erratic manner. It wasn't necessarily that you could look at him and he's dramatically reeling one way or another. But if you saw him and observed him, you could see he's stumbling. He's barely catching himself. He's almost falling over at some point, but he never falls. And this behavior is continuing the entire way. And he does wobble. He doesn't wobble wildly, but he wobbles. He wobbles when he walks. And so eventually. But that's what you see. What you see is you see some wobbling. You see some leaning. But in your complaint, that comes out a little bit more colorfully because you're saying that there are clear signs and symptoms of a medical emergency. That seems to be a bit of a stretch. Well, and I will grant the court that 12 people watching that video will come out with different viewpoints of what they see. And we, yes, we as trial lawyers will do our best to describe what is on video as best we can. And it is subject to interpretation. So I certainly understand how the court might go there. But it wasn't our intent to do that. Our intent was to clearly describe all of the behaviors and activities and actions that we saw him undertake while he was on the platform as shown in the video. And these are the same actions that any employee who would have been in, I'm getting cottonmouth, in the vicinity at the time. Thank you. Certainly would have had the opportunity to see and address pursuant to the duty to protect and the duty to render aid. Our issue, our big issue here with the circuit court's decision is by infusing into the four factors this notion that the assessment by an employee must be a medical assessment, that essentially eviscerates the restatement. Well, you're in essence saying that they have to perform some sort of a layman's differential diagnosis. The maintenance worker certainly has some skills trying to go over potential problems with a person who's acting a little odd on a subway platform. That's not, you know, that's not something a maintenance worker is expected to do. Well, I do think that laypeople do have the ability to see what was happening with this gentleman and arrive at a conclusion that something is definitely wrong with him in terms of disorientation. But how many times a day would a maintenance worker have to stop sweeping and go look at that person who's talking to himself or talking to herself or, you know, rocking around a little bit or is intoxicated on the platform or somebody who has no intention of ever getting on the train? A lot of people hang out on the L platforms in the city of Chicago. Well, you know, first of all, Your Honor, there are no facts in this case that tell us that. There are no facts that say it's one person a day or one person a month or three people an hour. But there are facts that tell us that there were 241 million people annually on the CTA. Right. And the other fact. On the trains. Yes. On the trains. Yes. And the other fact that we have in the case is the video that shows us for that 40-minute period, which is. . . It's more like 30. Okay, 30-minute period, we have a microcosm of what happens on the CTA. Yes, it's this platform, but there was only one individual who behaved that way. There was only one individual who stayed on that platform. There was only one individual who migrated two to three times to the edge of the platform in a precarious manner and one individual who towed that open door to the train at a time when we maintain that the train engineer or conductor should have seen him and may have seen him. And the discovery might reveal that, in fact, did see him when he was towing that door in that manner and should certainly should have done something at that point to protect him and did not. And we certainly believe the circuit court in the manner in which they concluded that the, with respect to the foreseeability factor and the likelihood of injury factor. Yes, and also the magnitude of the burden of guarding against this. I think that the trial court was concerned about that, too. The trial court was, but that was based on the court, the trial court having infused this requirement of medical assessment, which was not put in our case and we don't think it's necessary. And to do that, again, would be to eviscerate the restatement because then under no circumstance would any common carrier have an obligation to render aid. Well, why don't you read from your complaint what it is that they failed to do? What we read, what we stated was they failed to approach him and assess his condition. Assess. What does assess mean? It's the general word. We didn't say medically assess and we don't mean medically assess. We were very clear. Assess his condition despite clear signs and symptoms. Assess his condition. A maintenance man is expected to assess his condition? Yes, but when we use, you know, maybe we are guilty of being lawyers, but we use the word assess in the broadest sense. We'll all plead guilty to that. And we used it there in the broadest sense and we intentionally did not use it in tandem with the word medical. Okay. Go through some of your other allegations. The next one is to summon medical aid. That is to see that this man has some issue going on and to approach him and or summon medical aid for him and that doesn't require any sort of medical assessment. To turn off the third rail too, right? Yes, yes. Now, I mean, very honestly in terms of turning off the third rail, that is something that may be developed through, if we're allowed to proceed, through discovery. Because this is something where if there is an employee that we believe is out there who saw this behavior, he had a duty, the CTA had a duty through him to protect him and one of the ways that could have been done is to turn off the power. The CTA raises burden issues with that, claiming that then they would be turning off the power all day, every day. And to me, that's wild speculation. I think the CTA would probably use their judgment to turn off the electric rail at the appropriate times when they see somebody like this who's at risk of falling into the tracks. And the final item was to negligently fail to notify the emergency response personnel that a passenger was on the blue line platform who may need medical assistance. And the final one was failure to properly monitor the platform. And this is one where you might say, again, we lawyered it and wrote it broadly, but we certainly, what we meant was in terms of monitoring, that is, use your eyes and ears and look out for, as any common carrier employee would, look out for the well-being of the passengers. All right. Thank you. Thank you. Your Honors, good morning. May it please the Court. Your Honors, this morning I will explain that the duties that the CTA owed to Mr. Anderson in this particular case did not extend to the types of risks that are at issue here. And there are key risks here. It's the risk of protecting, it's the risk of falling from an elevated platform, which is the risk of falling from a height that's considered an open and obvious danger in Illinois. And the second risk is to provide horrendous aid to a disoriented person, to a person who is disoriented. Keep your voice up, please. Yes, the person who appears disoriented, not ill or injured, disoriented, with respect to the first risk of falling from the platform. In Illinois, it's well established that the risk of falling from a height is considered to be an open and obvious danger that's obvious to any adult or any child old enough to be left at large. And, you know, we cite Salami v. Eaton, Supreme Court decision, Sushi v. City of Geneva for this proposition. What constitutes open and obvious danger is also judged by an objective person's standard, not by a subjective standard. It does not depend on the plaintiff's subjective knowledge, but rather on the objective knowledge of a reasonable person confronting the same condition. And indeed, we cite cases in which the same standard applied to plaintiffs who were impaired. For instance, is Prostrand v. City of Chicago, was a visually impaired plaintiff who walked over the construction worksite without seeing a rock in the construction zone. And her case was a judgment for the defense based on the open and obvious danger, even though in that particular case the visually impaired plaintiff could not see the rock. But the condition as it was objectively was open and obvious. And in Browns v. City of Centralia, this is a recent Illinois Supreme Court decision, it was an 80-year-old woman who was going to an eye clinic, so presumably she had also an eye condition. And she walked over the defect in the sidewalk and fell. And it was held that even though this woman did not see the defect, subjectively she did not appreciate the danger, the sidewalk defect was an open and obvious danger, and therefore there was no legal duty that the city owed to her. In applying this doctrine to this case, the risk of falling from an elevated platform was open and obvious. And therefore the CTA did not owe a duty to Mr. Anderson to protect him from this open and obvious danger. Now there are two exceptions to this doctrine in Illinois. The plaintiff does not argue that either one applies to this case, but in any event, the exceptions are distraction exception and deliberate encounter exception. The deliberate encounter does not apply here at all because it's not alleged that Mr. Anderson deliberately jumped off the platform. There is a distraction exception, but again in Browns v. City of Centralia, the Illinois Supreme Court explained that where the distraction, even if the plaintiff was actually distracted subjectively, she did not see the defect. Where the distraction is solely within the plaintiff's own creation, it does not constitute distraction as a legal concept because the distraction exception focuses not on the subjective perception of the plaintiff, it focuses on whether it was objectively reasonable for the defendant to anticipate that certain external circumstances would distract the person from noticing an open and obvious danger. And in the Browns v. City of Centralia, the Supreme Court explained the distraction should not be solely within the plaintiff's own creation. The law cannot require a possessor of land to anticipate and protect against a situation that will only occur in the distracted mind of his invitee. And so from this statement of the law, it does not apply to the facts here because, again, there was no reason for the CTA to anticipate the diabetic shock, the alleged diabetic shock of the plaintiff here. And so based on this concept, and we cite many cases in our briefs, like Negron v. City of Chicago Park in northeastern New York. What kind of duty of care does the CTA owe? Excuse me, could you please repeat that? What kind of duty of care? Is it the highest duty of care or is it ordinary duty of care? Your Honor, it is our position in this case that this Court does not have to decide this issue because regardless of the degree of care, there is no duty that extends to this particular risk. But to answer your Honor's question, it is certainly our position that Mr. Anderson was not a passenger while he was a customer on the platform. He was not in the act of alighting or boarding the train. There was no train in sight. And I agree that there is some verbiage in cases saying that just the presence on the platform constitutes passenger status. But if one looks at the facts of these cases, every single case included a situation where there was an approaching train and the person was in the action of moving towards the train. Every single case. I mean, I read, I think, most of them. So one has to take this language with a grain of salt because in the factual circumstances, even in Skelton that, you know, I don't think remains a really good law to be in Skelton, the person was sitting on the platform waiting for 25 minutes. And then he noticed the train was passing by really quickly. And he was coming to the edge of the platform to wait for the train. And that was the basis on which the Court said. Of course, there was a demonstrated intent to board. He was trying to stop the train. So it is our position that just when the person is standing on the platform, I mean, there is no rationale to hold CTA as a premises owner, as the owner of, you know, the platform to a higher duty than any other business premises owner. And now going to the second alleged duty, the duty to grant the first aid. Under the restatement, it's triggered only by actual or constructive knowledge of illness or injury. And the plaintiff makes it really clear, and especially in her reply, that what her well-planned facts establish at most is the notice of disorientation. First of all, there is no issue of actual knowledge in this case. I mean, it's not alleged. The CTA somehow knew that Mr. Anderson was diabetic, that he was suffering a diabetic shock. The video also shows, and the circuit court noted in this decision, that the video, you know, is clear. He did not talk to anyone on the station. So it's not a situation where he told the CTA or someone else that he needed medical assistance, that he was suffering a medical emergency. So there's no issue of actual knowledge. The only issue is constructive knowledge. Should the CTA employees have known, you know, if they saw him, that he was ill or injured. And that is not even a position that the plaintiff herself takes. In her reply brief, she states, it was obvious and obviously pled that Anderson was suffering from disorientation on page 13. On page 15, Anderson and his disoriented condition was a circumstance of obvious departure from the norm behavior of CTA veterans. On page 11, the CTA ignores well-led facts of Anderson's disorientation and the outward manifestations of that disorientation. But the word disorientation is not mentioned once in the restatement of tort section 314A. And plaintiff does not cite a single case from anywhere where a premises owner would be held to the duty to render first aid just by apparent signs of disorientation. And certainly, it's a very nebulous concept. There are a lot of people on CTA platforms who might be disoriented. It may not necessarily be caused by any physical impairment. It could be a mental condition. It could be a psychiatric condition. There are a lot of indigent people on the platforms. There are absent-minded lawyers like I am. Sometimes, you know, may I be disoriented to people. And to impose a duty on the CTA employees, for instance, like a custodial worker, maintenance employee, to make a judgment when observing the person who appears to him or her disoriented that they need to call 911 or they need to call paramedics or they need to turn off power to the third rail, it's impractical. It is absolutely impractical in this situation. Because obviously, the danger here, of course, is that the finding by this court of illegal duty, it would not be limited to the circumstances of this particular case. It would affect the CTA as a municipal corporation system-wide. 145 platforms, operating trains, 24 hours a day, seven days a week. It would apply to the red line, you know, near the Cubs field where, you know, intoxicated people sometimes, you know, wobble. But again, the critical issue here is that Mr. Anderson did not fall to the ground. He did not bleed. He remained standing unassisted up until the last moments. And critically, I think when one re-explains this argument, they're saying if a person were observing Mr. Anderson for 30 or 40 minutes, they might have come to the conclusion that, you know, he is suffering from some sort of an issue. But there is no allegation in the complaint that that is in fact what happened, that there was an employee of the CTA who was observing Mr. Anderson for more than a few seconds at a time. And there is no single time that plaintiff identifies saying, okay, this is the moment in time when they should have rendered assistance. They are the moment in time. No. You know, the argument depends on someone observing his behavior over an extended period of time, and there is no allegation that anyone did that. So for these reasons, you know, we believe that, again, the types of risks that plaintiff alleges here, they are not, the duties do not extend to the types of risks. There is no case at all that plaintiff decides that would be similar to the situation here. And this is not the case, you know, in which to render this first impression, you know, holding like that. So if your owners do not have further questions, we'll ask that the circuit court judgment be affirmed. Okay. Thank you. Your Honors, quickly and briefly, the open and obvious doctrine certainly applies to known and obvious hazards, and by its own definition, contains an exclusion which reads, unless the possessor of land should anticipate the harm despite such knowledge of obviousness. And I believe in a case where an individual is suffering from a disorientation of whatever its source or cause, this is a case where he would not be able to appreciate the danger, and the possessor of land, seeing him, knowing of it, would know that he would not be able to appreciate that harm. So we don't believe, A, we don't believe that doctrine applies. But more so, in a case of duty, particularly with respect to common carrier, there's only one case I'm aware of that even considers the open and obvious doctrine in the context of the four factors, and that is Moreno versus the CTA. Jeff Mason, I know, was on that panel. I don't believe anyone else here was on that panel. But that wasn't the case of disorientation. That was a case where, ultimately, they looked at it as a factor and no more, and ruled that it was a question of fact for the jury because of a gap between the subway car and the platform. Interestingly, counsel for the CTA said to this court, Mr. Anderson did not bleed. Well, we maintain, and we still maintain, that his state of disorientation was enough to let any lay person understand that he had a serious problem. And no more would they need to know medical, understand medical diagnoses or assessments to be able to figure out if he had a problem than if he did bleed. Counsel also said, well, there's no case that has imposed or even discussed the duty in the case of a person who's disoriented. Of course, we pledge disoriented due to medical condition, but obviously, no person, no CTA employee could know that. What this means is this doesn't happen every day. What this means is under the magnitude burden factor number three and factor number four, the effect of that burden, it doesn't create the huge burden that the city CTA would like this court to believe. And so we believe that the approach of Marshall versus Burger King should have been taken in this case, and that is once the duty was found based on the special relationship, that's it, unless there was compelling public policy to determine otherwise. And we submit in this case there is no such compelling public policy. As a result, we ask that the decision of the circuit court be reversed so that we might proceed to discovery in this case. Thank you.